J-S34015-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE MATTER OF THE ADOPTION OF Q.M.H. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: K.J.H. | No. 1759 WDA 2013 |

Appeal from the Decree September 27, 2013
In the Court of Common Pleas of Erie County
Orphans' Court at No(s): Number 27 in Adoption 2013

BEFORE: GANTMAN, P.J., BENDER, P.J.E., and OTT, J.

MEMORANDUM BY OTT, J.:                    **FILED AUGUST 08, 2014**

K.J.H. ("Mother") appeals from the decree entered in the Court of Common Pleas of Erie County involuntarily terminating her parental rights to her legally adopted son, Q.M.H., born in November of 2002. We affirm the decree, and grant the petition for leave to withdraw as counsel filed by Mother's counsel.

On May 3, 2013, the Erie County Office of Children and Youth ("the Agency") filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b). The orphans' court appointed counsel for Mother on July 1, 2013. The termination hearing was held on September 27, 2013, during which the following witnesses testified: Cassie Lambert-Mierke, the Agency

caseworker; Duane Arnold, by telephone, the treatment coordinator at Beacon Light Behavioral Health Systems, a facility in which Q.M.H. then resided; June M. Stacy, Mother's friend; and Mother.

The testimonial evidence revealed as follows:

In December of 2002, when Q.M.H. was approximately four-weeks-old, the Agency removed Q.M.H. from his biological parents and placed him with Mother. N.T., 9/27/13, at 6. In 2005, Mother adopted Q.M.H.

Prior to the underlying dependency case which resulted in this appeal, the Agency was involved twice with this family after Q.M.H.'s legal adoption. In December of 2009, the Agency received an allegation that Q.M.H., then age seven, had performed oral sex. Ms. Lambert-Mierke testified that "[t]he case was opened for ongoing services, and closed in November of 2010[,] due to [Mother's] refusal to participate in any further services by the [A]gency." *Id*. at 7. In October of 2011, the Agency received a report that Mother was incarcerated. Ms. Lambert-Mierke testified that "the [A]gency was looking at adjudicating [Q.M.H.] dependent at that point in time, but [Mother] was released from jail and able to take care back [of] him." *Id*. at 8. As such, Ms. Lambert-Mierke testified that a case "was not opened; it was actually closed at the intake level." *Id*.

The instant matter arose from Mother contacting the Agency on October 24, 2012, and requesting the Agency take custody of Q.M.H. Ms. Lambert-Mierke, the Agency caseworker, testified Mother stated "that she

wanted the [A]gency to come and pick up [Q.M.H.], that she could no longer handle or manage his medical or mental health issues and his behaviors in her home." *Id*. at 8. She continued,

> [Mother] wasn't cooperative with the [A]gency at that time when they went to assess the situation on the 24th, and she refused to allow the intake specialist into her home and refused to state where the child was.
>
> Apparently [Q.M.H.] was not at her home at that time; however, on October 25th, the following day, the [A]gency received a referral that [Q.M.H.] had open wounds on his lower back and a mark on his arm, and it was reported by [Q.M.H.] that his mother had hit him with a belt the night before. On October 25th he was removed from the home and placed at Edmund L. Thomas dependent shelter, and at that time the child was requesting to be removed from the home.

*Id*. at 8-9.

Ms. Lambert-Mierke described Q.M.H.'s behavioral and other problems as follows:

> [Q.M.H.] is developmentally disabled. He does have a full-scale IQ of around 66. He does have some mental health issues as well. He has behavioral issues that he can become verbally and physically aggressive. He can be very noncompliant when he wants to be. He requires caregivers who are very consistent, very structured with specific behavioral plans. Right now he has a lot of anxiety issues as well that are exhibited in different ways.
>
> Again, he acts out in different settings when he has to transition. School is very difficult for him, very difficult environment for him. So he does have behavioral issues, but at the STRIDE program they've been able to provide consistent behavioral plans, consistent structure, consistent consequences, and he has made significant improvements.

*Id*. at 18-19.

On October 25, 2012, the Agency placed Q.M.H. at the Edmund L. Thomas shelter. *Id*. at 10. A shelter care hearing was held on October 26, 2012, and an adjudication hearing on November 1, 2012, neither of which Mother attended. *Id*. at 9. Mother did attend, however, the disposition hearing on November 19, 2012. Ms. Lambert-Mierke testified Mother "declined [at the disposition hearing] to have a treatment plan offered to her[1] and stated that she wanted to terminate her parental rights. . . ." *Id*. at 11. As such, the court set the permanency goal as adoption.

On January 30, 2013, the Agency placed Q.M.H. in the STRIDE program at Beacon Light Behavioral Health, a residential facility, where he remained at the time of the instant proceedings. *Id*. at 10, 18. Mr. Arnold testified that his facility is treating Q.M.H. for oppositional defiant disorder, impulse control disorder, autism spectrum disorder, and physical abuse. *Id*. at 47.

By decree dated September 27, 2013, and entered on September 30, 2013, the orphans' court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b). On October 25, 2013, Mother, acting *pro se*, filed a notice of appeal. Mother did not concurrently file a concise statement of errors complained of on appeal

_____

[1] The treatment, or reunification, plan included Mother participating in a mental health evaluation and following all recommendations, participating in random urinalysis, cooperating with the Agency, and participating in the recommendations for Q.M.H.'s treatment. N.T., 9/27/13, at 11.

pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). By order dated November 19, 2013, the orphans' court directed Mother to file a concise statement within ten days. Mother did not comply with the orphans' court order. In addition, on November 19, 2013, the orphans' court issued a Rule 1925(a) opinion.

By order dated January 3, 2014, this Court remanded the record and directed the Prothonotary to forward a new docketing statement to Mother's attorney of record, who was court-appointed on July 1, 2013, along with Mother's *pro se* notice of appeal. Further, this Court directed Mother, through her counsel, to file a concise statement *nunc pro tunc* within fourteen days, and directed the orphans' court to file a new Rule 1925(a) opinion in response.

Mother's counsel did not file a concise statement *nunc pro tunc*; rather, in lieu of a concise statement, on January 17, 2014, he filed with the orphans' court a statement of intent to file an ***Anders***[2] brief. ***See In the Interest of J.T.***, 983 A.2d 771, 772 (Pa. Super. 2009) (holding that, "[b]ecause the ***Anders*** procedure has been engrafted onto parental termination cases by ***In re V.E. and J.E.***, [ ], 611 A.2d 1267, 1275 (Pa.

_____

[2] ***Anders v. California***, 386 U.S. 738 (1967).

Super. 1992), counsel's decision to follow the [Pa.R.A.P.] 1925(c)(4) procedure in this parental termination case was proper").[3]

On March 19, 2014, Mother's counsel filed the *Anders* brief. On March 20, 2014, counsel filed an application to withdraw as Mother's counsel. On April 23, 2014, Mother filed *pro se* a response to the *Anders* brief in the form of a letter.

Before reaching the merits of the issues raised in the *Anders* brief, we must address counsel's request to withdraw. ***See Commonwealth v. Rojas***, 874 A.2d 638, 639 (Pa. Super. 2005) (stating, "[w]hen faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw[]") (citation omitted).

To withdraw pursuant to *Anders*, counsel must perform each of the following tasks:

_____

[3] Rule 1925(c)(4) provides as follows:

> In a criminal case, counsel may file of record and serve on the judge a statement of intent to file an *Anders[]* brief in lieu of filing a Statement. If, upon review of the *Anders[]* brief, the appellate court believes that there are arguably meritorious issues for review, those issues will not be waived; instead, the appellate court may remand for the filing of a Statement, a supplemental opinion pursuant to Rule 1925(a), or both. Upon remand, the trial court may, but is not required to, replace appellant's counsel. Pa.R.A.P. 1925(c)(4).

Pa.R.A.P. 1925(c)(4).

(1) petition the court for leave to withdraw stating that after making a conscientious examination of the record and interviewing the defendant, counsel has determined the appeal would be frivolous;

(2) file a brief referring to anything that might arguably support the appeal, but which does not resemble a "no merit" letter or *amicus curiae* brief; and

(3) furnish a copy of the brief to defendant and advise him of his right to retain new counsel, proceed *pro se* or raise any additional points that he deems worthy of the court's attention.

*In re S.M.B.*, 856 A.2d 1235, 1237 (Pa. Super. 2004). Thereafter, this Court must make an independent examination of the record to determine whether the appeal is wholly frivolous. *Id.*

Our Supreme Court, in *Commonwealth v. Santiago*, 978 A.2d 349 (Pa. 2009), stated that an *Anders* brief must comply with the following factors:

(1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Id.* at 361.

With respect to the third requirement of *Anders*, that counsel inform the defendant of his or her rights in light of counsel's withdrawal, this Court

has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." ***Commonwealth v. Millisock***, 873 A.2d 748, 752 (Pa. Super. 2005).

In his petition, Mother's counsel has satisfied the first requirement of ***Anders*** by filing a petition to withdraw wherein he asserts that he has made a conscientious review of the record and determined the appeal would be frivolous. Counsel has satisfied the second requirement by filing an ***Anders*** brief that complies with the requirements set forth in ***Santiago***, ***supra***. With respect to the third requirement, counsel has attached to the petition to withdraw a copy of the letter sent to Mother advising her of her rights, and enclosing a copy of the ***Anders*** brief. Thus, we conclude that counsel has complied with the ***Anders*** requirements.

We next determine whether Mother's claim is wholly frivolous. The ***Anders*** brief filed by counsel raises four issues, as follows:

1. Whether the [orphans'] court committed an abuse of discretion or error of law by concluding that the Agency established sufficient grounds to involuntarily terminate the Mother's parental rights as required by 23 Pa.C.S.A. § 2511(a)(1)[?]

2. Whether the [orphans'] court committed an abuse of discretion or error of law by concluding that the Agency established sufficient grounds to involuntarily terminate the Mother's parental rights as required by 23 Pa.C.S.A. § 2511(a)(2)[?]

3. Whether the [orphans'] court committed an abuse of discretion or error of law by concluding that the Agency established sufficient grounds to involuntarily terminate the Mother's parental rights as required by 23 Pa.C.S.A. § 2511(a)(5)[?]

4. Whether the [orphans'] court committed an abuse of discretion or error of law by concluding that termination of [Mother's] parental rights would be in the best interests of the child as required by 23 Pa.C.S.A. § 2511(b)[?]

*Anders* brief at 8.

Our standard of review is as follows:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, [___ Pa. ___, ___, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, [___ Pa. ___], 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, [575 Pa. 647, 654-655], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

*In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the

standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S.A. § 2511). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

This Court need only agree with any one subsection of 2511(a), in addition to section 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Instantly, we review the decree pursuant to section 2511(a)(1) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> > . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be

- 10 -

beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A § 2511(a)(1), (b).

Parental rights may be terminated pursuant to section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child *or* fails to perform parental duties. *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003) (emphasis added). Our Supreme Court has stated that parental duty "is best understood in relation to the needs of a child." *In re Burns*, 379 A.2d 535, 540 (Pa. 1977).

A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. . . .

*Id.*; *see also In re C.M.S.*, *supra*.

Our Supreme Court has held,

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998). Further,

- 11 -

the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re N.M.B.*, 856 A.2d 847, 854-855 (Pa. Super. 2004) (citations omitted).

Finally, with respect to section 2511(b), the requisite analysis is as follows:

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Instantly, the Agency filed the petition seeking the involuntary termination of Mother's parental rights on May 3, 2013. The operative period for the application of section 2511(a)(1) is the six-month period preceding the filing of the petition, *i.e.*, November 3, 2012 – May 3, 2013. The orphans' court found on the record and in open court that the Agency proved by clear and convincing evidence that Mother evidenced a settled

purpose of relinquishing her parental claim and/or failed to perform her parental duties. Further, the orphans' court found that the Agency proved by clear and convincing evidence that termination of Mother's parental rights would be in Q.M.H.'s best interest. The court stated that terminating Mother's parental rights would "offer [Q.M.H.] the best opportunity for a permanent resolution of his current circumstances in a way that would provide him with the care necessary to ensure a loving and safe environment in the future." N.T., 9/27/13, at 35.

The record evidence supports the decree terminating Mother's parental rights pursuant to section 2511(a)(1). Mother did not appear for the shelter care hearing on October 26, 2012, or the adjudication hearing on November 1, 2012. Although she appeared for the disposition hearing on November 19, 2012, at which time the Agency's permanency goal was reunification concurrent with adoption, Mother requested at the hearing to terminate her parental rights, and she refused the Agency's reunification plan. *Id*. at 11. As such, following the disposition hearing, the court set the permanency goal as adoption, and Mother did not file a notice of appeal from that order. *Id*. at 12. Ms. Lambert-Mierke, the Agency caseworker, testified that, on November 29, 2012, Mother contacted the Agency "twice in one day and stated to get the paperwork taken care of as quickly as possible to [voluntarily relinquish her parental rights]." *Id*. at 14.

The record reveals that Mother thereafter changed her mind on voluntarily relinquishing her parental rights. The record includes a letter, dated December 10, 2012, written by Mother to the juvenile court judge, indicating that she did not want to terminate her parental rights. *See* N.T., 9/27/13, at Mother's Exhibit 1. On January 17, 2013, Mother, through counsel, filed a petition for reunification, which requested a change of goal. N.T., 9/27/13, at 13; *see also* Petitioner's Exhibit 3. However, on March 14, 2013, Mother, through counsel, filed a motion to withdraw the petition for reunification, which the juvenile court granted on March 15, 2013. *See id*. In addition, on March 13, 2013, Mother again requested that the Agency prepare the paperwork to voluntarily relinquish her parental rights. N.T., 9/27/13, at 14.

On direct examination, Ms. Lambert-Mierke testified as follows:

Q. In your review of the [A]gency records, this desire of [Mother] to relinquish her rights to [Q.M.H.], did that just start in October of 2012?

A. No. Actually during the time that [the case] was open in 2010 she had started expressing that she wanted to give him back, that he was just very difficult. She wanted to drop him off at the [A]gency. . . . She felt that he was too difficult to handle, that she had to file for bankruptcy to care for him, nobody wanted to manage his behaviors, and that she just couldn't handle him.

*Id*. at 14-15.[4]  Significantly, Ms. Lambert-Mierke testified,

> Q.  Did [Mother] at any time represent to you a desire to work with the [A]gency to have [Q.M.H.] returned to her care?
>
> A.  No, she did not.

*Id*. at 24.

Since Q.M.H. was removed from her care on October 25, 2012, Mother visited him once, on November 30, 2012, for fifteen minutes, and she telephoned him once, both while he was residing at the Edmund L. Thomas shelter.  N.T., 9/27/13, at 10, 16, 29.  Mother has not contacted Q.M.H. or inquired as to his welfare since that time.  Mr. Arnold, the treatment coordinator at Beacon Light Behavioral Health, testified Mother has not contacted the facility since Q.M.H. has been in residence, *i.e.*, January 30, 2013.  *Id*. at 48.  Mother brought birthday presents to the disposition hearing on November 19, 2012, which was subsequent to Q.M.H.'s birthday.

---

[4] Ms. Lambert-Mierke testified Q.M.H. was receiving respite care in 2010, and that he was likely receiving respite care before then.  N.T., 9/27/13, at 31, 33.  She testified that the Agency provided Mother with a subsidy to assist her with paying for Q.M.H.'s respite care.  *Id*. at 15.  In the 2012-2013 fiscal year, Mother was approved for a subsidy in the amount of $30,000.  *Id*.  Further, Ms. Lambert-Mierke testified that the Agency continued to pay Mother the subsidy even after Q.M.H. was removed from her care.  She explained that "Domestic Relations [does a] child support order, which she was [c]ourt-ordered to pay the exact amount that she was receiving in the subsidy back to Domestic Relations.  That would then, again, be funneled to the [A]gency for the reimbursement of the subsidy."  *Id*. at 24.  Ms. Lambert-Mierke testified that Mother had not been complying with the child support order.  *Id*.

*Id*. at 17. However, she did not give him Christmas or Easter gifts. *Id*.

Mother has not sent him any cards or letters. *Id*. Mother testified she did

not visit Q.M.H. more than once because the Agency did not permit her. *Id*.

at 73. In addition, she testified she was not allowed to contact Q.M.H. *Id*.

On cross-examination by the Agency, Mother denied that she

requested the Agency remove Q.M.H. from her custody on October 24,

2012. N.T., 9/27/13-II, at 3.[5] However, Mother acknowledged that she

wanted to voluntarily relinquish her parental rights at the time of the

disposition hearing. On cross-examination by the Agency's counsel, Mother

testified as follows:[6]

> Q. So if I understand your testimony right, when you're in front
> of [the juvenile judge] in November and you stated what you did
> about your son, it was because you were worried about yourself
> being charged with a felony, is that right?
>
> A. Worried, scared.
>
> Q. But that's what motivated you, you were worried about . . .
> yourself and what was going to happen to you as a result of your
> son's actions?

---

[5] The notes of testimony from the termination hearing on September 27, 2013, are in two separate transcripts, reflecting the morning and afternoon testimony. We identify the second transcript, which includes the continuation of Mother's testimony, counsels' closing arguments, and the court's findings, as "N.T., 9/27/13-II".

[6] We note that Mother was represented by three separate counsel in the underlying dependency matter prior to her current counsel being appointed on July 1, 2013. *See* N.T., 9/27/13, at 70-71.

A. Yes.

N.T., 9/27/13-II, at 11-12. Specifically, Mother indicated in her testimony she was afraid of felony charges related to Q.M.H. allegedly slapping an elderly woman who assists him and the other school children in the van that transports them to and from school, and Q.M.H. allegedly breaking the glasses of a child on the school van. N.T., 9/27/13, at 61. Further, Ms. Lambert-Mierke testified that Mother stated "she was concerned about criminal charges against her due to [Q.M.H.'s] behaviors and him accusing her of abusing him." N.T., 9/27/13, at 12.

With respect to why she withdrew the petition for reunification, *i.e.*, to change the goal from adoption to reunification, Mother testified on inquiry by the orphans' court as follows:

> THE COURT: -- you filed a request to withdraw the petition for reunification?
>
> [MOTHER]: Without prejudice.
>
> THE COURT: Without prejudice, yes, and I signed that order.
>
> [MOTHER]: Yes.
>
> THE COURT: [] And it seemed from your testimony this morning --
>
> [MOTHER]: Yes.
>
> THE COURT: -- that you wanted to wait to see how your son's treatment went –
>
> [MOTHER]: Yes.
>
> THE COURT: -- before doing anything?

- 17 -

[MOTHER]: Yes.

N.T., 9/27/13-II, at 17-18.

Finally, Mother testified on cross-examination by the Guardian *Ad Litem* ("GAL") as follows:

Q. With regard to [Q.M.H.], what have you done to try to get him back?

A. What have I done? I'm here right now, okay, trying to get him back.

Q. Hm-hmm, a year later?

A. A year later, yeah.

N.T., 9/27/13-II, at 16.

We conclude that the foregoing record and testimonial evidence supports the decree terminating Mother's parental rights pursuant to section 2511(a)(1) in that Mother, for a period of six months before the filing of the termination petition, evidenced a settled purpose of relinquishing her parental claim to Q.M.H. or failed to perform her parental duties. To the extent the court's decision that Mother's conduct warrants termination under section 2511(a)(1) is based on credibility determinations in favor of the Agency's witnesses and against Mother, we will not disturb it. ***See In re Adoption of S.P.***, ***supra***. Indeed, the testimonial evidence demonstrates that Mother first considered relinquishing her parental rights in 2010. In October of 2012, she requested that the Agency remove Q.M.H. from her home, and, on November 19, 2012, during the disposition hearing, she

- 18 -

expressed her desire to relinquish her rights.  Even after Mother changed her mind to voluntarily relinquish her parental rights, she did not perform any parental duties or cooperate with the Agency for the purpose of reunifying with Q.M.H.  As such, we discern no abuse of discretion by the court with respect to section 2511(a)(1).

With respect to section 2511(b), Mr. Arnold, the treatment coordinator at Beacon Light Behavioral Health, testified as follows:

> Q.  In your time observing [Q.M.H.], would you say there's been any negative impact on him of being away from his mother. . . ?
>
> A.  In my professional opinion, I would say since he's been here overall he has improved since he first got here.
>
> Q.  Is that your way of saying there has been or has not been an impact from being away from [Mother]?
> A.  Actually I think it[]s been a plus that he has not had any interaction with family due to the relationship problems that we have seen when he came in.

N.T., 9/27/13, at 49.  Although Mr. Arnold testified that Q.M.H. gets upset when he observes other children in the facility going home with their families, he does not express the desire to go home to Mother; rather, he expresses the desire to be part of a family in general.  *Id*. at 48, 50-51.  Mr. Arnold testified,

> Q.  In your observation of [Q.M.H.], what kind of caregiver does this young man need?
>
> A.  He needs someone that is going to be very patient, be involved highly on a daily basis, because he requires someone to observe him almost right around the clock due to his behaviors.

*Id*. at 49.

With respect to Q.M.H.'s progress while at the Beacon Light facility, Mr. Arnold testified:

Q. The program that you have, what would you be looking at? Do you have a discharge date?

A. We do not have a discharge date at this time due to the difficulty in developing relationships and maintaining them in a proper manner.

Q. His discharge date then, is it based mainly on improving his behaviors to a level where he can go into the community or to another resource?

A. Correct.

Q. And he still has some work to do to get there?

A. Yes.

*Id*. at 49-50.

Ms. Lambert-Mierke testified that there would be no detrimental effect to Q.M.H. if Mother's parental rights are terminated. *Id*. at 22. She testified that there is no bond between Q.M.H. and Mother, and that Q.M.H. has not requested to return to Mother's home. *Id*. at 20-21. Ms. Lambert-Mierke testified with respect to the Agency's plan for Q.M.H. as follows:

Q. And what would be the [A]gency's plan for this child should rights be terminated?

A. We have been, again, looking at discharge resources, long-term discharge resources for [Q.M.H.] He may need a step-down to a therapeutic foster care home and then go to the long-term discharge resource. . . . [Q.M.H.] requires a patient, tolerant, consistent, structured caregiver.

*Id*. at 20. We conclude that the foregoing testimonial evidence supports the orphans' court determination that terminating Mother's parental rights will serve the developmental, physical and emotional needs and welfare of Q.M.H. pursuant to section 2511(b). Upon our independent review of the record, we agree with Mother's counsel that the instant appeal is wholly frivolous.

Finally, we have considered Mother's letter response to counsel's ***Anders*** brief, wherein she baldly asserted that she was "misrepresented" by her court-appointed counsel during the termination hearing. Mother denied that she physically abused Q.M.H. She also implied that she does not trust the Agency or the orphans' court judge. Mother provides no citations to the record or to legal authority to support her position that the orphans' court should not have terminated her parental rights. Thus, we are not persuaded by Mother's response to counsel's ***Anders*** brief. We further observe that the GAL filed a brief in support of the orphans' court decision to terminate Mother's parental rights pursuant to section 2511(a)(1), (2), (5), and (b). Accordingly, we affirm the decree terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).

Decree affirmed. Petition to withdraw as counsel granted.


Judgment Entered.

- 21 -

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/8/2014</u>